IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.  CRIMINAL ACTION NO. 2:25-cr-00107

TERREANCE JEROME WILDER

**MEMORANDUM OPINION & ORDER**

Pending before the court is Defendant Terreance Jerome Wilder's Motion to Suppress Evidence. [ECF No. 20]. The Government responded on July 31, 2025. [ECF No. 26]. The court held a Pretrial Motions Hearing on August 7, 2025. [ECF No. 31]. Because the officers lacked reasonable suspicion to conduct a stop, the motion is **GRANTED**.

I. **BACKGROUND**

On November 2, 2024, at 10:35am, a tipster called 911 to report that there was a "Black male with a gun." [ECF No. 20-1, at 00:11–00:19] (911 call audio). The anonymous caller described the man as wearing "a red hoodie [] and long black sweatpants." *Id.* The caller stated that the man walked into a Tudor's Biscuit World restaurant after waving a gun five minutes earlier. *Id.* at 00:20–00:37. When the 911 operator asked for clarification, the caller just yelled "he was waving it." *Id*. at 00:40–00:48. The call lasted a total of 49 seconds.

When the call ended, the 911 operator started a "dispatch report." [ECF No. 20-2]. In the report, the operator noted that a "BML red hoodie blk sweatpants had a gun, was waving it in the air 5 mins ago." *Id.* The operator also noted that the caller "started screaming" when she asked more questions. *Id.*

With only this information, Officers Hart Childress and Zachary Richards were dispatched

at 10:38 a.m. *Id.*; [ECF No. 20-3] (Officer Richards bodycam footage). Officer Richards, approaching the restaurant, asked bystanders if "there was a guy with a gun out here." [ECF No. 20-3, at 00:05–00:08]. Before the bystanders responded, Officer Richards approached the Defendant, Terreance Jerome Wilder, who was dressed exactly as the tipster described. *Id.* at 00:08–00:15.

Officer Richards asked if the Defendant had a weapon, and the Defendant responded no. *Id.* Officer Richards then asked, "can I just pat you down real quick while we are talking," and immediately began patting the Defendant down. *Id.* at 00:08–00:30. During the pat down, Officer Childress grabbed the Defendant's arms and held them up in the air. *Id* at 00:20–00:30. The Defendant asked why he was being patted down, but he was not given an answer. *Id.* Officer Richards located a firearm in Mr. Wilder's right front pocket and ordered Officer Childress to put him in handcuffs. [ECF No. 20-4, at 01:08–01:30].

After learning that Mr. Wilder had a prior felony conviction, the officers arrested the Defendant for possession of a firearm. [ECF No. 26, at 3]. On June 10, 2025, a grand jury returned an indictment against Mr. Wilder in the Southern District of West Virginia for being a felon in possession in violation of 18 U.S.C. § 922(g).

## II.  LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The amendment prevents "arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Brown*, 401 F.3d 588, 592 (4th Cir. 2005) (quoting *INS v. Delgado*, 466 U.S. 201, 215 (1984)). Nevertheless, "[l]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public

place . . . ." *Florida v. Bostick*, 501 U.S. 429, 434 (1992) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). To determine the appropriateness of a stop, a court considers the circumstances of the stop and seizure.

"[A] 'seizure' warranting protection of the Fourth Amendment occurs when, in view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to leave or otherwise terminate the encounter." *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002). The totality of the circumstances test is an objective one, and in applying the test, a court may consider

> the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen.

*Id.* at 310.

"A police officer may elevate a police-citizen encounter into an investigatory detention only if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000) (internal quotations omitted); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'"). The reasonable suspicion analysis must focus on the police officer's reasonable suspicion before the seizure. *See United States v. General*, 435 F. Supp. 2d 502 (E.D.N.C. 2006) (holding that a Defendant's actions after he has been seized are not relevant to a reasonable suspicion analysis). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the

stop.[1] *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989).

The reasonable suspicion standard, though less demanding than the probable cause standard, requires a minimal level of objective justification. *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). "Reasonable suspicion is something more than an inchoate and unparticularized suspicion or hunch." *Burton*, 228 F.3d at 527 (internal quotation and citation omitted). The Government bears the burden of "articulat[ing] facts sufficient to support reasonable suspicion." *Id.* at 528.

### III.  DISCUSSION

This case comes down to one inquiry: does *Navarette* control (as the Government argues) or does *J.L.* control (as the Defendant argues).[2] In essence, did the officers have reasonable suspicion to conduct a *Terry* stop of the Defendant? After considering the totality of the circumstances, the answer is no.[3]

Determining whether an officer had reasonable suspicion to justify a stop-and-frisk is "somewhat abstract," and the Supreme Court has cautioned against reducing the inquiry to "a neat set of legal rules." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citing *Ornelas v. United States*, 517 U.S. 690, 695–96 (1996)). Instead, the analysis considers the "totality of the circumstances." *Id.* at 273–74. That standard requires a court to weigh both the content of the information known to the officers and its degree of reliability, along with what the officers themselves observed before acting. *Id.*

---

[1] "Moreover, [a court's] determination of reasonable suspicion must give due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) (demonstrating a tip from a "regular, reliable informant" possesses a particular "indicia of reliability" when paired with an officer's experience).
[2] *Navarette v. California*, 572 U.S. 393, 399 (2014) (911 call tip provided enough information for officers to have reasonable suspicion); *Florida v. J.L.*, 529 U.S. 266, 267 (2000) (911 call tip did not provide enough information).
[3] Of course, like many similar cases, this one is a close call. *See Navarette*, 572 U.S. at 399; *Alabama v. White*, 496 U.S. 325, 325 (1990).

In *Florida v. J.L.*, the Supreme Court held that an anonymous tip describing a young Black male carrying a gun did not provide reasonable suspicion for a frisk. 529 U.S. 266, 267 (2000). In that case, the tip accurately offered the appearance and location of the defendant, but it "provided no predictive information" and gave no basis for believing that the tipster had inside knowledge of J.L.'s affairs. *Id*. at 271.

By contrast, in *Navarette v. California*, 572 U.S. 393, 394 (2014), the Court upheld a stop where the 911 tip bore sufficient indicia of reliability and described ongoing dangerous conduct. In *Alabama v. White*, 496 U.S. 325, 326 (1990), the Court found reasonable suspicion where an anonymous tip was corroborated in significant respects.

Here, the government relies on an anonymous 911 call reporting "a Black male with a gun" outside a restaurant. [ECF No. 20-1, at 00:11–00:37]. The caller, speaking in a calm, matter-of-fact tone, described the Defendant's clothing and stated that he was waving a gun. *Id.* When the operator asked if the gun was being pointed at anyone, the caller, without specifically responding, said "he's waving it." *Id*. at 00:40–00:48. Notably, the caller described the conduct five minutes after it occurred.[4]

The body-cam footage from the responding officers—the real-time experience of the officers—shows that the stop of the Defendant occurred in broad daylight, in a public area, and with pedestrians walking around the lot. *See* [ECF No. 33-2]. Three individuals lingered casually nearby, looking at their phones. *Id.* The diners in the restaurant continued to eat their food without commotion. Before the stop, the officers observed no threatening movements, no attempt to flee,

---

[4] One of the Government's arguments is that the 911 tip was not truly anonymous and therefore reliable. The Supreme Court has held that anonymous tips often lack sufficient indicia of reliability to justify the use of a *Terry* stop. *See Florida v. J.L.,* 529 U.S. 266, 266–67 (2000). In that case even an "accurate description of a subject's readily observable location and appearance" was not enough to justify a *Terry* stop. *Id*. at 272. Here, the tipster alleged a Black male wearing a red hoodie and black sweatpants at Tudor's had a gun. The call lasted 49 seconds, and the tipster never identified himself or described Mr. Wilder's conduct with specificity. Alone, this does not amount to reasonable suspicion.

and no visible firearm.[5]

These facts alone indicate that the officers encountered a non-threatening environment.[6] Based on all the evidence, I observe that no one in the vicinity of the Defendant was reacting to any perceived threat. Still, the Government emphasizes that the tip described a man "waving" a gun—not merely possessing one. Nothing the officers saw on arrival corroborated that tip, and the fact that officers *did* find a gun does not aid the Government's argument. *J.L.*, 529 U.S. at 271 ("That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting" the defendant.). Here, the totality of the circumstances heavily considers the uneventful scene in front of the officers, unable to satisfy reasonable suspicion under *J.L.*

I do not doubt that the officers acted calmly, professionally, and without undue aggression. Similarly, I cannot ignore the Defendant's actual commission of a crime (a felon in possession). But reasonable suspicion is judged at the moment of the seizure, not with the benefit of hindsight. In that moment, the officers had no lawful basis to search. Suppression is a severe remedy, but it is compelled here because the search was constitutionally unreasonable.

I recognize (as counsel did at the motions hearing) that the line the Fourth Amendment draws is often a difficult one for courts and for officers in the field. The totality of the circumstances analysis looks different in every scenario—a crowded bar at 3 a.m., a report of a high-capacity automatic weapon, the identification of a bomb, or circumstances indicating that the

---

[5] The only threatening movement alleged by the Government is the Defendant lowering his arm slightly during the stop. This is irrelevant, the frisk had already begun.

[6] The Government's argument that the expertise and training of the officers creates an inference of reasonable suspicion also fails. "A police officer may elevate a police-citizen encounter into an investigatory detention only if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *Burton*, 228 F.3d at 527 (internal quotations omitted). Here, outside a single tip, the officers did not ascertain any additional articulable facts about criminal activity. Neither training, expertise, nor perceptions about the local area authorize unconstitutional searches and seizures.

danger was still unfolding. These, however, are simply examples of facts that, along with others, might alter the totality analysis. Here, the surrounding circumstances taken as a whole do not meet the constitutional threshold.

The Constitution does not measure reasonableness by the absence of bad faith or by the ultimate discovery of contraband. Instead, the Constitution demands that stops like these be grounded in articulable facts to create reasonable suspicion when the stops occur. Even in a case where officers act with professionalism and restraint, suppression is the required remedy when that constitutional standard is not met.

This is true even when firearms are present. Though firearms surely pose a unique danger to the public, the presence of a firearm is not enough—on its own—to justify a stop. *J.L.*, 529 U.S. at 273 (demonstrating that unlike in situations where a bomb threat is prevalent, or in public venues where Fourth Amendment protections are diminished, danger alleged in a gun-related anonymous tip is not so great as to justify a search "without a showing of reliability"). The presence of a gun in *J.L.* was insufficient to conduct a stop.

Similarly, the Defendant's location, outside a restaurant, does not diminish his Fourth Amendment rights. This case is a far cry from those contexts suggested in *J.L.*, an airport and a school. *See Florida v. Rodriguez*, 469 U.S. 1, 5 (1984) (holding that a temporary detention for questioning in the case of an airport search is reviewed under the lesser standard enunciated in *Terry*); *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (holding the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the Fourth Amendment requirements). Instead, the Defendant was stopped and searched solely based on the tip.

By the time Officers Childress and Richards arrived, the Defendant was outside the

restaurant with a straw in one hand and a drink in the other. He did not pose a "present danger," and when the officers approached him, they were not fearing the Defendant. Still, they quickly began a search of his person. Without reasonable suspicion, this was unconstitutional.

Of course, I recognize the dangers that officers face daily. Radical gun violence no doubt requires officers to act with consistent decisiveness and selflessness. Still, the Fourth Amendment stands to protect all.

## IV.   CONCLUSION

For these reasons, the Defendant's Motion to Suppress Evidence, [ECF No. 20], is **GRANTED**.

The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:     August 12, 2025

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE